# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARIANNE SADELMYER, | )<br>) |
| Plaintiff, | ) Civil Action No. 2: 12-cv-1785<br>) |
| v. | ) |
| WARDEN J. PELTZER, DEPUTY WARDEN TEAMUS, FACILITY DOCTOR ISLEY, M.D., LEVERNE ROSSI, FACILITY NURSE, AND SERGEANT CHIPPS, | ) United States Magistrate Judge<br>) Cynthia Reed Eddy<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## **MEMORANDUM OPINION AND ORDER**

Presently pending is the "Supplemental Motion for Summary Judgment" with brief in support, filed by Defendants Warden J. Peltzer, Deputy Warden Teamus, Leverne Rossi, Facility Nurse, and Sergeant Chipps (ECF Nos. 56 and 57), the Motion for Summary Judgment, with brief in support, filed by Defendant Facility Doctor Isley, M.D. (ECF Nos. 60 and 61), and the Opposition filed by Plaintiff, Marianne Sadelmeyer (ECF No. 64).

The issues have been fully briefed and the factual record has been developed. *See* ECF Nos. 58, 59, 62 and 64. After careful consideration of the motions, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that the motions should be granted.[1]

---

[1] The parties have consented to jurisdiction by the undersigned Magistrate Judge. *See* ECF Nos. 1-4; 13; and 28.

1

#### FACTUAL BACKGROUND

Plaintiff, Marianne Sadelmyer, is a prisoner currently incarcerated at Albion Correctional Facility, in Albion, New York. This matter involves events that purportedly transpired from August 17, 2012, through October 3, 2012, during the forty-eight (48) days that Plaintiff was confined at Washington County Correctional Facility (the "Correctional Facility"). Complaint at ¶ 1. From August 17, 2012, through September 25, 2012, Plaintiff was confined as a pretrial detainee; on September 26, 2012, however, Plaintiff's status changed to that of a convicted prisoner as she was sentenced to a two (2) year term of probation on that date. She remained in the Correctional Facility until October 3, 2012, at which time she was released to the New York State Police for extradition to New York.[2]

Plaintiff initiated this action on December 7, 2012, by the filing of a Motion for Leave to Proceed in forma pauperis. The motion was granted and the Complaint was filed. (ECF No. 7.) Named as Defendants are Warden J. Peltzer (now the former Warden), Deputy Warden Teamus (now the current Warden), Laverne Rossi, Facility Nurse (name incorrectly spelled in case caption), Sergeant Eli Chipps (hereinafter collectively referred to as the "Washington County

---

[2] Based on the Court's review of The Unified Judicial System of Pennsylvania Web Portal, Plaintiff was arrested by the Canonsburg Police on August 17, 2012, and charged with identity theft; unauthorized use of access device, forgery, theft by deception - false impression; theft by unlawful taking - movable property; and false identification to a law enforcement officer. On September 26, 2012, Plaintiff pled guilty to the unauthorized use of access device charge and was sentenced to two (2) years of probation. The remainder of the charges against her were nolle prossed on that day. http://ujsportal.pacourts.us/DocketSheets/CommonPleasDocket Sheets/CPReport.ashx?DocketNumber=CP-63-CR-002149-2012. Plaintiff remained in the Washington County Correctional Facility until she was extradited to New York on October 3, 2012.

Defendants") and Matthew Eisley, M.D., a facility doctor (named incorrectly spelled in case caption).

Defendant Matthew Eisley, M.D., previously filed a Motion to Dismiss, as did the Washington County Defendants who filed a Motion to Dismiss Pursuant to F.R.C.P. 12(b)(6) in the Form of a Motion for Summary Judgment (ECF No. 45). The Court advised the parties that the Washington County Defendants' motion would be converted into a motion for summary judgment under Federal Rule of Civil Procedure 56 and that the motion would be evaluated under the standard set forth in Rule 56 of the Federal Rules of Civil Procedure.

The Court dismissed Plaintiff's claims under the Eighth Amendment regarding unsanitary conditions of confinement, her claim under the Fourteenth Amendment, and her claim that she was discriminated against in violation of the American with Disabilities Act. The Court denied without prejudice Plaintiff's claim of medical deliberate indifference under the Eighth Amendment, with the exception that Plaintiff's claim that she was required to sleep without a mattress was dismissed.

At the time the Court ruled upon the Motions to Dismiss, it had not been provided with any of Plaintiff's medical records. As explained in the Memorandum Opinion, the Court found that Plaintiff's medical records were relevant to the Defendants' claim that Plaintiff received proper care and that a determination on this issue could not be made until the Court had an opportunity to review these medical records.

The Court has now been provided with Plaintiff's medical records,[3] and the Washington County Defendants and Defendant Eisley move for summary judgment on Plaintiff's sole remaining claim: medical deliberate indifference under the Eighth Amendment.

**STANDARD OF REVIEW**

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. *National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*,

---

[3] The Court notes that the Washington County Correctional Facility, Health Care Screening Form dated August 17, 2012, identifies the inmate as "Sadelmyer-Freeman, Marianne" and the hospital discharge records from Washington Hospital dated August 18, 2012, refer to the patient as "Marion Freeman." According to the Observer-Reporter, at the time of her arrest, Plaintiff identified herself to the Canonsburg police as "Marion Jean Freeman." http://www.observer-reporter.com/apps/pbcs.dll/article?AID=/20120903/loc05/120909806.

477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson*, 477 U.S. at 251–52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. *Anderson*, 477 U.S. at 249–50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed.R.Civ.P. 56(c); *Celotex*, 477 U.S. at 324.

## DISCUSSION

In accordance with the Eighth Amendment's prohibition against cruel and unusual punishment, the government is obliged "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Id.* at 104 (citation omitted). "[W]hether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed . . . deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id.* at 104–05 (citations omitted).[4]

---

[4] For purposes of analyzing Plaintiff's medical indifference claim, the legal analysis is the same whether Plaintiff was a pretrial detainee or a convicted person. The United States Court of Appeals for the Third Circuit has indicated that a pretrial detainee's right to adequate medical care should be analyzed under the well-settled standard established in *Estelle v. Gamble,* 429 U.S. 97 (1976), which provides that prison officials are required "to provide basic medical

5

A medical need is "serious" if "it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation omitted). "The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment." *Id.*

The "deliberate indifference" a plaintiff must allege lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other" and is frequently equated with recklessness as that term is defined in criminal law. *Farmer v. Brennan,* 511 U.S. 825, 836–37 (1994). This standard "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients." *Inmates of Allegheny Cnty. Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir. 1979). Where a prisoner has received medical care and only the adequacy of the treatment is disputed, courts are often reluctant to second guess professional medical judgment. *See id.*

However, deliberate indifference can be manifested by an intentional refusal to provide care, delayed medical treatment, and the denial of prescribed medical treatment. *See Durmer,* 991 F.2d at 64; *Giles v. Kearney,* 571 F.3d 318, 330 (3d Cir. 2009) ("Deliberate indifference may be shown by intentionally denying or delaying medical care.").

Plaintiff's remaining claims are that (i) she was not seen by a doctor until eleven (11) days after her suicide attempt; and (ii) she was neither treated for Xanax withdrawal, which can

---

treatment to those whom it has incarcerated." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle,* 429 U.S. 97 (1976)).

cause suicidal thoughts and actions, nor was she weaned from Fentanyl, which has serious medical consequences when not weaned from the system.

Defendant Eisley contends that he provided "adequate, timely and appropriate treatment, based upon his professional medical judgment, to Plaintiff at the times that he was requested to treat her. He never intentionally refused to provide care, delayed her medical treatment or denied her any prescribed medical treatment and/or medications." Def's Br. at 3 (ECF No. 61.) The Washington County Defendants contend that all of Plaintiff's medical issues were appropriately addressed by facility personnel throughout her stay at the Correctional Facility. In support of their position, the Washington County Defendants attach the Supplemental Affidavit of Cheryl McGavitt, RN.

Based upon a detailed review of the supplemental documentary record evidence, the Court finds that Plaintiff received appropriate medical treatment for her physical and mental health issues at all times during her incarceration at the Correctional Facility. A review of the summary judgment medical record demonstrates the following:

Plaintiff arrived at the Correctional Facility on August 17, 2012, at which time a Nursing Intake Assessment was conducted.[5] Plaintiff reported having hip replacement surgery nine and a half weeks prior and "reported having a fractured pelvis and broken wrists." Plaintiff also reported that on August 1, 2012, she had been treated for mental health or emotional problems,

---

[5] According to the Affidavit of Cheryl McGavitt, R.N., prior to Plaintiff being brought to the Correctional Facility, she was seen in Canonsburg Hospital. She was admitted to the Correctional Facility with a slip "release to police custody with medical clearance." Nurse McGavitt's requested Plaintiff's medical records from Canonsburg Hospital, but Canonsburg Hospital never responded to her request. (ECF NO. 59-1, at ¶ 3.)

but also reported that she had never attempted suicide nor had she ever considered suicide. *See* G-1 at 1. The nurse noted that Plaintiff complained of "numerous maladies" and did not show any signs or symptoms of withdrawal. *Id.* at 3. Plaintiff was assigned a Medical Clinic Handicap cell because she required the use of aluminum braces on both of her arms.

During the early morning hours of August 18, 2012, Plaintiff complained of chest pains, left arm pain, and jaw pain. She was transported to Washington Hospital at 12:35 AM and returned from the Emergency Department at 5:00 AM with a diagnosis of "chest pain / anxiety." No follow up treatment was ordered. *See* Exh. G-3.

Later that morning, at 9:50 AM, the nursing staff verified Plaintiff's home medications with Jeffrey's Drug Store: Percocet, Prilosec, Fentanyl, Xanax, Soma, and Metformin. At that time, it was verified that Plaintiff had filled prescriptions for Xanax only on two occasions, July 6, 2012, and July 30, 2012. Accordingly, she did not meet the frequency of length of use to begin Xanax detoxification protocol.[6] *See* Exh. G-1 and Exh. G-5, physician's orders.

At 1:05 PM that afternoon, the nursing staff was notified that Plaintiff "had fallen." When asked what happened Plaintiff "changed story a couple of times. 1st stated she fell on right side, then stated she fell on left side." Exh. G-2 at 6. An ambulance was called and Plaintiff was transported back to the Washington Hospital Emergency Department. At 3:13 PM on August 18, 2012, Plaintiff was discharged from the Washington Hospital Emergency Department with a diagnosis of hip contusion / depression / anxiety. She was directed to follow-

---

[6] According to Plaintiff, "Defendants were aware that Plaintiff was in a domestic violence situation and had changed her name repeatedly to hide. The nurses would not check on any of the other names that Plaintiff had medications prescribed to her under." Pl's Resp. at ¶ 3.

up with Family Medicine unless better and "please have psych consult." Upon returning to the facility, Plaintiff was placed on the list to see psychiatrist Dr. Kolli at his next weekly visit on August 23, 2012. Exh. G-4.

Later that evening, at 6:55 PM, Plaintiff was discovered hanging from the air vent in her cell in an apparent suicide attempt. She was placed on the floor, her vital signs were taken and were noted to be stable. It was determined that Plaintiff did not require any medical treatment. She was transferred to Processing Cell No. 2, where she remained until she was transferred back to the Medical Clinic on August 29, 2012. Plaintiff remained in the Medical Clinic until she was released to the New York State police. *See* Exh. G-2.

The following day, August 19, 2012, Plaintiff complained of nausea / vomiting, leg cramps, and sweating. A standing order was implemented for Fentanyl detox protocol based on Plaintiff's complaints and symptoms. A Clonidine TTS #1 patch was applied as per protocol and a blood pressure check sheet was started.

On August 20, 2012, Plaintiff complained of nausea / vomiting and diarrhea. She was given Mylanta by Nurse Shakira Aitken.

Contrary to Plaintiff's allegations, the medical records reveal that on August 23, 2012, which was six days after her suicide attempt, Plaintiff was seen by psychiatrist Dr. Kolli.[7] His notes reflect that she admitted to attempting to kill herself, claiming she had an anxiety attack, and was suffering from Xanax and pain medication withdrawal. She also told Dr. Kolli that she

---

[7] Plaintiff contends that she was not seen on August 23, 2012. However, Defendants have provided the Court with medical records from Southwestern Behavioral Care, Inc., Family Health, which reflect that Plaintiff was seen on August 23, 2012, and again on September 20,

9

was undergoing a detoxification program. Dr. Kolli discontinued her suicide watch, started her on two new medications (Neuronton and BuSpar) and ordered a follow-up visit for September 20, 2013. Dr. Kolli ordered that Plaintiff be given meds at 9:00 p.m. daily. *See* Exh. G-8 and G-6.

That evening, Plaintiff complained to Nurse Aitken that she had not received her 9:00 p.m. meds for the past several nights, although the record clearly reflects that Dr. Kolli ordered the 9:00 p.m. meds for the first time that day.

The nurses notes from August 24, 2012, indicate that Plaintiff complained that she did not get her Metformin or snack the prior evening. The medical record reflects that Plaintiff, in fact, had refused her Metformin on August 21, 22, and 23, complaining of diarrhea and nausea. Further, it was explained to Plaintiff that only insulin dependent diabetics receive bed time snacks. The medical record also indicates that Plaintiff complained that she had not been receiving her 9:00 p.m. meds for the past two days. Plaintiff was informed that she had, in fact, taken the meds as ordered. *See* Exh. G-6 and G-9.

According to the medical records of August 25, 2012, it appears that Plaintiff attempted to tamper with the results of her blood sugar testing. As a result of the incident, there is a notation on the blood sugar log to not allow Plaintiff to test her own blood sugar, as she was found to be "deceptive and manipulative while doing it herself." *See* Exh. G-2. Plaintiff responds that Defendants' claim is false. Pl's Resp. at ¶ 4.

---

2012. *See* Exh. G-8.

The medical record evidence also demonstrates that Dr. Eisley examined Plaintiff on September 10, 2012 and again on September 14, 2012, for a host of medical complaints, and where appropriate prescribed some form of treatment. Dr. Eisley's notes reflect that Plaintiff indicated that she did not need to be examined but that she just wanted to talk to the doctor. Dr. Eisley noted that she looked very comfortable, smiled, and laughed, although she described her pain as severe. *See* Exh. G-2 at pp. 1-3.

On September 20, 2012, Plaintiff was seen by psychiatrist Dr. Kolli for her follow-up appointment. She told Dr. Kolli that New York state was coming to get her soon. She complained of not sleeping well but that Neurontin was helping her at the high dose. She requested to try Trazodone. Dr. Kolli ordered an increase in BuSpar, in Neurontin, and added Trazadone. He also ordered a follow-up appointment in 8 weeks. *See* Exh. G-5, G-6, and G-8.

The medical evidence of record reflects that on October 1, 2, and 3, Plaintiff refused the prescribed Neurontin doses. *See* Exh. G-6 and G-13. On October 3, 2012, Plaintiff was released from the Correctional Facility to the custody of the New York state police for extradition to New York.

Significantly, the summary judgment medical record evidence reflects that Plaintiff refused to provide the Correctional Facility with an authorization to obtain her previous medical records. She also told the medical facility personnel that she had her hip replacement in Sacramento, California, under an alias, and refused to provide the name of the hospital or the alias that she used when she received the surgery. Additionally, Plaintiff on three separate occasions gave differing dates on when she had her hip replacement surgery: on August 17,

11

2012, she reported that her hip replacement surgery was performed 9-1/2 weeks previous (Exh. G-1 at 1); on August 18, 2012, she reported that she had bilateral hip implants 7 weeks previous (Exh. G-2 at 6); and on September 14, 2012, she reported that she was six months post bilateral hip replacement (Exh. G-2, at 1).

The Court finds that the summary judgment record evidence conclusively establishes that Plaintiff's medical complaints were appropriately addressed by the facility personnel and Dr. Eisely throughout her confinement at the Correctional Facility. The record is replete with evidence of medical treatment. Defendants present evidence that Plaintiff received medical treatment almost daily from the date of her incarceration on August 17, 2012, through the date she was released to the New York police on October 3, 2012. She was routinely visited by nurses and was seen by Dr. Eisley on two separate occasions, where appropriate prescribed treatment. As a result, Defendants are entitled to summary judgment because Plaintiff cannot establish a genuine issue of material fact.

Defendants are also entitled to summary judgment on Plaintiff's claims that she was neither treated for Xanax withdrawal nor was she weaned from Fentanol. The nursing staff was informed that Plaintiff has filled a prescription for Xanax only on two occasions; therefore, she did not qualify for the Xanax detoxification program. Furthermore, the record clearly reflects that on August 19, 2012, a standing order for Plaintiff was implemented for Fentanyl detox protocol; a Clonidine TTS #1 patch was applied per protocol, and a blood pressure check sheet was started. Plaintiff, in fact, reported to Dr. Kolli on August 23, 2012 that she was being detoxed with a Clonidine patch.

The Court finds that this case presents a record of regular medical attention to Plaintiff's numerous medical issues. Plaintiff cannot establish that Defendants acted with deliberate indifference to any of her medical needs.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment filed by the Washington County Defendants and the Motion for Summary Judgment filed by Defendant Eisley will be granted. An appropriate Order follows.

## ORDER

**AND NOW**, this 25th day of November, 2014, IT IS HEREBY **ORDERED** as follows:

1. The Supplemental Motion for Summary Judgment filed by the Washington County Defendants is **GRANTED.**

2. The Motion for Summary Judgment filed by Defendant Matthew Eisley, M.D. is **GRANTED.**

The Clerk of Court shall docket this case closed.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Plaintiff has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

s/ Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge

cc:     MARIANNE SADELMYER
13G298
Albion Correctional Facility
3595 State School Road
Albion, NY 14411-9399
(via U.S. First Class Mail)

Paul D. Krepps
Marshall, Dennehey, Warner, Coleman & Goggin
(via ECF electronic notification)

Jason J. Zivkovic
Dickie, McCamey & Chilcote, PC
(via ECF electronic notification)

Katie M. Mills
Dickie, McCamey & Chilcote, PC
(via ECF electronic notification)